IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BOBBY DULA,                          )
                                     )
              Plaintiff,             )
                                     )
     v.                              )        1:19CV740
                                     )
ANDREW SAUL,                         )
Commissioner of Social Security,     )
                                     )
              Defendant.             )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Bobby Dula ("Plaintiff"), *pro se*, brought this action pursuant to Section 205(g)

of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying his claim for

Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-

motions for judgment, and the administrative record has been certified to the Court for review.

I.     PROCEDURAL HISTORY

Plaintiff protectively filed his application for DIB on September 26, 2017, alleging a

disability onset date of December 24, 1992. (Tr. at 9, 85.)[1] His claim was denied initially (Tr.

at 26-34, 52-55), and that determination was upheld on reconsideration (Tr. at 35-44, 56-59).

Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative

Law Judge ("ALJ"). (Tr. at 60, 63-64.) However, on August 10, 2018, Plaintiff submitted a

---

[1] Transcript citations refer to the Administrative Record [Doc. #13].

Waiver of Right to Personal Appearance Before an Administrative Law Judge, in which he noted that the evidence previously submitted "should be enough to make the decision." (Tr. at 62.) Accordingly, the ALJ issued his decision without Plaintiff's appearance or testimony in accordance with 20 C.F.R. § 404.948(b). (Tr. at 9.) The ALJ concluded that Plaintiff was not disabled within the meaning of the Act between his alleged onset date and June 30, 1997, his date last insured. (Tr. at 14.) On July 14, 2019, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

## II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

2

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work;" if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between his alleged onset date, December 24, 1992, and his date last insured, June 30, 1997. Plaintiff therefore met his burden at step one of the sequential evaluation process. (Tr. at 11.) At step two, the ALJ further determined that Plaintiff suffered from a single severe impairment: "bilateral genu varum." (Tr. at 11.)[4] The ALJ next found at step three that this impairment failed to meet or equal a disability listing. (Tr. at 11.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, through his date last insured, Plaintiff had the RFC to perform the full range of medium work. (Tr. at 12.) In reaching this conclusion, the ALJ found that:

> The evidence of record does not establish that [Plaintiff's] bilateral knee impairment was at a disabling severity at any time from the alleged onset date

---

[4] Bilateral genu varum is colloquially known as bow-leggedness.

of disability of December 24, 1992 through the date last insured of June 30, 1997. The evidence[] indicates that [Plaintiff], who was a military recruit for a short time, had knees that could not tolerate the physical rigors of boot camp; it does not establish that he was unfit for work in the civilian labor economy. . . . [A]n orthopedic note dated December 24, 1992 indicates that he had a history of genu varum with residual deformity and anterior knee pain; the treatment plan for his pain called for rest, nonsteroidal anti-inflammatory drugs, and strengthening exercises for his quadriceps. . . .

Furthermore, the evidentiary record does not document that [Plaintiff] received any medical treatments or underwent any medical studies between December 1992 and his date last insured. However, x-rays of his knees that were filmed in December 2011 showed normal knees with "normal alignment present with no osseous abnormalities identified with no significant degenerative changes." (Exhibit 4F/4.) Given that [Plaintiff] did not undergo any medical procedures after December 1992, it is likely that the condition of his knees during the period at issue was similar to their condition documented in the December 2011 x-rays.

In light of the evidence of record—benign clinical findings, conservative therapies, and normal x-rays, [Plaintiff's] bilateral knee impairment was not disabling during the period at issue. Accordingly . . . he had the residual functional capacity to perform medium work.

(Tr. at 12-13.) At step four of the analysis, the ALJ found that Plaintiff had no past relevant work. (Tr. at 13.) However, at step five, the ALJ found that, given Plaintiff's age, education, work experience, and RFC, he could perform other jobs available in the national economy. (Tr. at 13-14.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 14.) [5]

Plaintiff, proceeding *pro se*, now contends that substantial evidence fails to support the ALJ's decision. At step three of the sequential analysis, Plaintiff argues that the ALJ erred by failing to consider whether Plaintiff met Listing 14.09, which is the listing applicable for certain

---

[5] The ALJ alternatively found that even if Plaintiff were limited to light or sedentary work, the result would be the same. (Tr. at 13.)

Case 1:19-cv-00740-LCB-JEP     Document 20     Filed 08/28/20     Page 6 of 20

immune system disorders. Plaintiff also raises three, related challenges to his RFC assessment. In particular, Plaintiff contends that the ALJ (1) failed to properly consider all of the relevant evidence, (2) failed to consider "pain as a disabling condition," and (3) failed to give "more probative weight . . . to other forms of evidence, including lay and Post DLI evidence," in light of the State agency physicians' inability to assess his functional status. (Pl.'s Br. [Doc. #16] at 1-3.) After a thorough review of the record, the Court finds that none of Plaintiff's contentions merit remand.

A.     Listing 14.09

Plaintiff first contends that the ALJ erred by failing to consider whether Plaintiff had rheumatoid arthritis that met or equaled a listed impairment in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 14.09 ("Listing 14.09"). At step three of the sequential analysis, an ALJ must determine whether a claimant's impairments meet or equal the medical criteria of 20 C.F.R., Pt. 404, Subpt. P, App. 1, which sets forth a list of impairments that warrant a finding of disability without considering vocational criteria. 20 C.F.R. § 404.1520(d); see also Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) ("A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition meets or equals the listed impairments." (internal quotations and citations omitted)). Notably, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). Moreover, the claimant has the burden of presenting evidence to establish that all of the criteria are met. See Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986).

Case 1:19-cv-00740-LCB-JEP     Document 20     Filed 08/28/20     Page 7 of 20

Here, the ALJ did not identify rheumatoid arthritis as a severe impairment at step two

of the sequential analysis, nor did he mention arthritis at later steps of the analysis, including

step three. This was not due to an error on the part of the ALJ, as Plaintiff suggests; rather,

there was simply no evidence of rheumatoid arthritis during the relevant time period. As

previously set out in this District,

> [t]he duty to identify relevant listed impairments is triggered when there is
> "'ample evidence in the record to support a determination' that the claimant's
> impairment meets or equals one of the listed impairments. . . ." Ketcher v.
> Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999) (quoting Cook, 783 F.2d at 1172-
> 73; see, e.g., Martin v. Colvin, No. 1:11CV408, 2014 WL 4114207, at *4
> (M.D.N.C. Aug. 20, 2014); Drane v. Colvin, No. 1:10CV901, 2014 WL 408753,
> at *4 (M.D.N.C. Feb. 3, 2014); see also Morgan v. Colvin, No. 7:13-CV-279-
> BO, 2014 WL 6473525, at *2 (E.D.N.C. Nov. 18, 2014) ("The ALJ's failure to
> consider [the] Listing . . . in this instance, where there is obviously evidence that
> may support the listing, is clear error."). "Neither the Social Security law nor
> logic commands an ALJ to discuss all or any of the listed impairments without
> some significant indication in the record that the claimant suffers from that
> impairment." Ketcher, 68 F. Supp. 2d at 645.

McCauley v. Colvin, No. 1:13CV534, 2016 WL 3566659, at *6 (M.D.N.C. June 24, 2016). In

McCauley, the court found that (1) the plaintiff's "brief fail[ed] to point to any medical findings

demonstrating that his impairments equal or meet all the criteria of Listing 1.02A," and (2) the

record lacked "evidence sufficient enough to trigger the ALJ's duty to discuss [that] Listing."

Id. at *7 (citing Clansy v. Comm'r of Soc. Sec., No. SAG-15-0106, 2015 WL 6152253, at *2

(D. Md. Oct. 16, 2015) (unpublished) (finding several requirements of a Listing "not present

on the record . . . thus no ample evidence exists to mandate an express discussion of the

Listing")). Accordingly, the plaintiff's step three challenge failed.

Similarly, in the present case, the record is devoid of evidence sufficient to trigger

discussion of Listing 14.09. Plaintiff had a single positive ANA test in 2013, sixteen years after

8

his date last insured, and was referred to a rheumatologist. (Tr. at 191, 196).[6] Subsequent ANA tests were negative on August 14, 2018 and August 18, 2018 (Tr. at 201, 202), and there is no evidence in the record that Plaintiff was ever seen by a rheumatologist or diagnosed with rheumatoid arthritis. In November 2014, seventeen years after the date last insured, Plaintiff went to the High Point Regional Hospital complaining of joint pain. (Tr. at 242-46). He reported that "he had some lab work done over a year ago in October of 2013 and was told he had a positive ANA" but "hasn't been referred to anyone." (Tr. at 242.) Plaintiff reported symptoms that were "progressively getting worse . . . [and] now getting in the way of his daily living." (Tr. at 242.) That record reflects a differential diagnosis of "gout, a[rth]ritis, RA, [or] Lupus" (Tr. at 243), with a referral to a rheumatologist for specific diagnosis (Tr. at 244), and a diagnosis at discharge of "Arthralgia" (joint pain) (Tr. at 246). There is no evidence of any further follow-up or any more specific diagnosis.

As Defendant correctly points out, the only evidence of arthritis between 1993 and 1997 is Plaintiff's own assertion in 2013 that he had experienced joint pain for "20 plus years." (Def.'s Br. [Doc. #18] at 9); (Tr. at 198.) Such statements are not considered objective medical evidence. See Craig v. Chater, 76 F.3d 585, 590, n.2 (4th Cir. 1996) (explaining that a physician noting a claimant's subjective complaints does not "transform[] his observations into 'clinical evidence.' If this were true, it would completely vitiate any notion of objective clinical medical evidence. There is nothing objective about a doctor saying, without more, 'I observed my

---

[6] A positive ANA test reflects an autoimmune reaction, but is not a specific test for rheumatoid arthritis. (Tr. at 191); see also Green v. Astrue, No. CIV.A. WGC-09-2897, 2011 WL 1542505, at *4 n. 12 (D. Md. Apr. 21, 2011) ("ANA is an acronym for Anti–Nuclear Antibody. The ANA blood test is a nonspecific screen for autoimmune stimulation. Its use in Rheumatology is to screen for Connective Tissue Disease; however, the presence of an ANA is not isolated to rheumatic diseases.")

9

patient telling me she was in pain.'"). Thus, the record before the ALJ did not include any evidence that Plaintiff had ever been diagnosed with rheumatoid arthritis, let alone that he suffered from this impairment prior to his 1997 date last insured.

In his filings before this Court, Plaintiff contends that this claim is supported by evidence dated <u>after</u> the date of the ALJ's November 2, 2018 decision. However, Plaintiff did not submit the evidence as part of his filings in this case, and it is not clear what he is relying on or whether he is asking the Court to consider new evidence not previously submitted. To submit new evidence to this Court that was not previously submitted in the administrative proceeding, Plaintiff would need to make a "showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (sentence six). Plaintiff has not attempted to make that showing here, and as noted above, has not submitted any medical records or other evidence for consideration under that standard.

In his appeal to the Appeals Council, Plaintiff submitted a piece of what appears to be a medical record that he contends was from a recent evaluation. (Tr. at 24.) That document includes only the "medical history" portion of the record, and reflects that Plaintiff reported that the pain in his knees had worsened over time, that Plaintiff reported that he had been diagnosed with rheumatoid arthritis in 2014, and that Plaintiff brought labs from October 1996 "that showed" rheumatoid arthritis. (Tr. at 24.) However, the document does not include any examination, diagnosis, or opinion, and appears to be just a piece of a medical record reflecting Plaintiff's reported history. The Appeals Council concluded that the submission did not relate to the relevant period and did not affect the decision about whether

10

Plaintiff was disabled before June 30, 1997. (Tr. at 2.) See also 20 C.F.R. § 404.970 ("The Appeals Council will review a case if— . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."). Plaintiff has not established any basis to reverse that determination, where the document is an incomplete portion of a record and does not reflect what it is, when it is from, or how it relates to the disability determination prior to June 30, 1997.[7]

Moreover, even if Plaintiff could show that a diagnosis of rheumatoid arthritis existed at the time in question, he fails to further demonstrate any evidence that this impairment met or equaled a listed impairment at that time. Listing 14.09, which covers inflammatory arthritis, requires a claimant to show:

> A.  Persistent inflammation or persistent deformity of:
>   1.  One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or
>   2.  One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).
>
> OR
>
> B.  Inflammation or deformity in one or more major peripheral joints with:
>   1.  Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and
>   2.  At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

---

[7] Plaintiff appears to be contending that the summary of his reported history in the document reflects that earlier blood tests would be consistent with a later diagnosis of rheumatoid arthritis. However, the document itself is incomplete and does not support that conclusion, and as discussed above, the medical records as a whole do not reflect an actual diagnosis of rheumatoid arthritis. Moreover, Plaintiff has not shown even a meaningful possibility—much less a reasonable probability—that the additional evidence would change the outcome of the decision, given the evidence discussed *infra* showing a clear inability to meet Listing 14.09 in any event.

11

OR

C.  Ankylosing spondylitis or other spondyloarthropathies, with:
1.  Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or
2.  Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.

OR

D.  Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1.  Limitation of activities of daily living.
2.  Limitation in maintaining social functioning.
3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 14.09.

Here, the medical records note no inflammation of Plaintiff's knees or any other joint. While Plaintiff's genu varum, i.e., bow-leggedness, could conceivably qualify as a persistent deformity of one or more major joints, neither Plaintiff nor any evidence of record suggest that this condition resulted in the inability to ambulate effectively, as defined by the Act,[8] nor is there evidence of at least moderate involvement of two or

_____

[8] Section 1.00B2b(1) defines the inability to ambulate effectively as

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit

12

more organs/body systems, nor is there evidence of at least two constitutional signs or symptoms. Additionally, there is no evidence of "repeated manifestations of inflammatory arthritis with at least two documented constitutional symptoms and signs," nor is there evidence of marked limitation in activities of daily living, social functioning, or completing tasks in a timely manner prior to June 30, 1997. In fact, Plaintiff specifically reported to his medical providers in 2014 that, although his episodes of joint pain had been "progressively getting worse" for over a year, they had only recently begun interfering with his daily activities. (Tr. at 242.) In addition, the records from Plaintiff's medical visit in December 2011, noted by the ALJ in connection with the normal x-rays (Tr. at 13), further reflect the provider Dr. Lloyd's assessment as follows:

> Are there constitutional symptoms of arthritis? No
> Are there incapacitating episodes of arthritis? No
> Standing limitations: Able to stand more than 1, but less than 3 hours
> Functional limitations on walking: Able to walk 1-3 miles
> Assistive devices/aids: None
> . . .
> Is there inflammatory arthritis? No
> . . .
> Is there joint ankylosis? No

---

> independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 1.00B2b(1). Section 1.00B2b(2) then goes on to provide "examples of ineffective ambulation," which

> include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation; the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 1.00B2b(2).

13

Case 1:19-cv-00740-LCB-JEP   Document 20   Filed 08/28/20   Page 13 of 20

(Tr. at 183). That medical record also reflects that Plaintiff's knee pain resulted in severe limitations on his ability to participate in sports and moderate limitations on his ability to exercise and drive, but only mild limitation on his ability to do chores and recreation, and no limitation on his ability with respect to shopping, traveling, feeding, bathing, dressing, toileting, and grooming. (Tr. at 185). This assessment in 2011 reflects no evidence that would come even close to rising to the level of meeting Listing 14.09 at that time, let alone prior to 1997. Overall, the Court simply cannot conclude that there is "'ample evidence in the record to support a determination' that [Plaintiff's knee] impairment me[t] or equal[ed] one of the listed impairments" during the time period at issue here. Ketcher v. Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999) (quoting Cook v. Heckler, 783 F.2d 1168, 1172-73 (4th Cir. 1986)). Nor is there a "fair amount of evidence supportive of his claim." Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Thus, the record before the ALJ did not include evidence that would have triggered further analysis of Listing 14.09 for the relevant time period, and any failure is harmless in any event given the clear lack of evidence to support Plaintiff's contention as to Listing 14.09.

B.     RFC Claims

Plaintiff's failure to file a claim with the Social Security Administration until twenty years after the expiration of his insured status impacts nearly every aspect of his remaining arguments. In particular, Plaintiff argues that the ALJ (1) failed to properly consider all of the relevant evidence, (2) failed to consider "pain as a disabling condition," and (3) failed to give "more probative weight . . . to other forms of evidence, including lay and Post DLI evidence," in light of the State agency physicians' inability to assess his functional status. (Pls.' Br. at 1-

3.) However, as explained in the ALJ's decision, the agency's regulations require that, for Title II claims, factfinders only consider evidence relevant to the time period between a claimant's alleged onset date and his date last insured. While Plaintiff is correct that post-DLI evidence *may* be relevant in certain instances, this is only true where such evidence relates back to the time period at issue. See Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 340-41 (4th Cir. 2012) ("[P]ost–DLI medical evidence generally is admissible in an SSA disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre–DLI condition").

As noted above, the only evidence linking Plaintiff's recent joint pain to his condition prior to June 30, 1997 are Plaintiff's own reports to his physicians in 2013 and 2014 that he had been experiencing such pain for "20 plus years." (Tr. at 198.)[9] Although Plaintiff also cites his 2011 knee x-rays as evidence supporting his claims, these records describe his knees as "normal" (Tr. at 182-85), and additional knee x-rays from 2013 show only "mild degenerative joint disease" (Tr. at 263-64).

Significantly, no medical evidence, from the time period at issue or otherwise, suggests that Plaintiff was incapable of performing the medium work identified in the RFC assessment. The ALJ acknowledged that Plaintiff's genu varum was a severe impairment of long standing (Tr. at 11), and the record further indicates that the condition stemmed from either Blount's Disease or Ricketts and led to Plaintiff's treatment with leg braces as a child (Tr. at 216, 182).

---

[9] Plaintiff claims that his positive ANA test "confirmed the initial diagnosis of rheumatoid arthritis in [his] joints in the duration of . . . 20 plus years." (Pl.'s Br. [Doc. #16] p. 3) (omitting multiple commas). However, as previously noted, a positive ANA result only indicates an autoimmune response at a given point in time, and no diagnosis of rheumatoid arthritis, or any other autoimmune disorder, appears in the record.

Plaintiff's VA records from the 1992-93 specifically note that Plaintiff's genu varum, which ultimately prevented his military service, was a preexisting deformity, and although Plaintiff reported that it had not caused much pain for several years, he contends that boot camp exacerbated it. (Tr. at 12, 182, 212-17.) Nevertheless, there is no evidence that this exacerbation was of long duration,[10] nor is there evidence that the pain or the underlying condition were severe enough to prevent medium level work. As noted by the ALJ, while "an orthopedic note dated December 24, 1992 indicates that [Plaintiff] had a history of genu varum with residual deformity and anterior knee pain," the note further reflected very conservative treatment for Plaintiff's pain, consisting of "rest, nonsteroidal anti-inflammatory drugs, and strengthening exercises for his quadriceps." (Tr. at 12) (citing Tr. at 216). Although the record contains evidence of further medical treatment during the relevant time period, it does not appear that Plaintiff received any additional treatment for knee pain prior to his date last insured. (Tr. at 225-33.)[11]

More recent medical evidence continues to show conservative treatment. In fact, Plaintiff's treatment notes from 2013 and 2014 emphasize that he took no medications for any conditions, having refused the recommended medication to treat his uncontrolled high blood pressure. (Tr. at 196-98.) Plaintiff reported to his physician that he previously used ibuprofen,

_____

[10] Plaintiff's Medical Board Report specifically notes that Plaintiff's pre-existing genu varum "ha[d] not been aggravated permanently" by his brief military service. (Tr. at 217.)

[11] Plaintiff's treatment records from 1995-96 pertain to emergency room treatment for back strain on April 7, 1995 after he pulled his back "at work" (Tr. at 225-26), an alleged assault on October 29, 1996 (Tr. at 230), and abdominal pain the next day on October 30, 1996 (Tr. at 232-33). None of these records address Plaintiff's knee pain. The ALJ noted that "the evidentiary record does not document that the claimant received any medical treatments or underwent any medical studies between December 1992 and his date last insured" (Tr. at 12), which appears to be a reference to the absence of treatment records for Plaintiff's knee condition.

16

which did not help his pain, and that he sometimes used a knee sleeve for support. (Tr. at 199.) Strengthening exercises were again recommended (Tr. at 199), and in August 2014, Plaintiff was referred to a rheumatologist in light of his prior positive ANA result (Tr. at 196). In November 2014, Plaintiff was seen in the emergency department for "multiple joint pain." (Tr. at 242.) He was prescribed prednisone and again referred to rheumatology. (Tr. at 244.) However, there is no evidence that Plaintiff followed up on either referral.

Overall, Plaintiff provides no credible support for his allegations that the ALJ improperly ignored favorable evidence in this case. Although Plaintiff now argues that the ALJ erred by failing to consider certain evidence (see Pl.'s Br. at 1-3), the records he cites consist of his own administrative brief (Tr. at 162-63) and notes explaining that some of Plaintiff's medical records aren't available due to the time lapse (Tr. at 176-80).[12] As further noted both here and in the ALJ's decision, the remaining, available evidence consists of "benign clinical findings, conservative therapies, and normal x-rays," all of which support the ultimate determination that Plaintiff's knee impairment was not disabling during the period at issue. (Tr. at 13.)[13]

---

[12] Plaintiff contends that some unspecified records may have been destroyed or were no longer available given the extended passage of time. Under the Act, Plaintiff bears the burden of proving disability by producing evidence to support his claim. See Hall, 658 F.2d at 264. Here, Plaintiff could have pursued disability at any time. By waiting to file until two decades after his date last insured, Plaintiff accepted the risk that some of the evidence related to his claim might be unavailable. Moreover, the only records Plaintiff points to are Community Health Clinic records from February 1993 for a follow-up visit after Plaintiff returned from military service, without any further allegations as to what those records would reflect. Those records were later destroyed by the Clinic because Plaintiff had not returned since 1993. (Tr. at 176, 179.)

[13] As the ALJ further noted, even if Plaintiff were limited to light or sedentary, rather than medium, work, "the outcome of this case would remain the same" in light of Plaintiff's status as a younger individual between 1992 and 1997. (Tr. at 13.)

Plaintiff's allegation that the ALJ failed to adequately account for the impact of Plaintiff's pain on his ability to work is equally unpersuasive. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, [such as pain,] be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304, 82 Fed. Reg. 49462, 49467 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. The ALJ should not reject a claimant's statements "about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. § 404.1529(c)(2). Thus, "subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." Lewis v. Berryhill, 858 F.3d 858, 866 (4th Cir. 2017). However, it is also undisputed that a plaintiff's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities [only] to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Thus, objective medical evidence and other evidence in the record are "crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs [the] ability to work" and "[a]lthough a claimant's allegations about . . . pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available

18

evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [ ]he suffers." Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595); see also SSR 16-3p ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities . . . ."). According to the regulatory guidance:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p.

In the present case, a thorough review of the ALJ's decision and the record as a whole reveals that the ALJ properly considered objective medical evidence and other evidence and explained that determination in the decision. In evaluating the evidence, the ALJ specifically noted that evidence of joint pain, its treatment, and its severity during the time period in question is minimal. (Tr. at 12-13.) The same holds true for Plaintiff's more recent pain reports. Although Plaintiff contends that the evidence supports his claim of disabling pain, the records cited by Plaintiff consist of his own Pain Questionnaire (Tr. at 131-32), VA appeal paperwork noting Plaintiff's recent complaints of joint pain and his referral to a rheumatologist (Tr. at 135), and a medical treatment note recounting Plaintiff's own reports of 20 years of recurrent joint pain for which he took no medication (Tr. at 198). Notably, in another

treatment note dated November 26, 2014, Plaintiff specifically reported that his episodes of joint pain had begun getting progressively worse for over a year and had recently begun interfering with his daily activities. (Tr. at 242.) In addition, as discussed above, the records from Plaintiff's medical visit in December 2011, noted by the ALJ in connection with the normal x-rays (Tr. at 13), further reflect the provider Dr. Lloyd's assessment that Plaintiff's knee pain resulted in severe limitations on his ability to participate in sports and moderate limitations on his ability to exercise and drive, but only mild limitation on his ability to do chores and recreation, and no limitation on his ability with respect to shopping, traveling, feeding, bathing, dressing, toileting, and grooming. (Tr. at 185). Even viewing these records in the light most favorable to Plaintiff, nothing suggests that the ALJ failed to properly consider the effects of Plaintiff's pain on his ability to work prior to July 1997.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. #15] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #17] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 28th day of August, 2020.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge

Case 1:19-cv-00740-LCB-JEP    Document 20    Filed 08/28/20    Page 20 of 20